UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| DAVID WEFER, | : Case No. |
|                 Plaintiff, | : **COMPLAINT** |
|      v. | : **DEMAND FOR JURY TRIAL** |
| LSC COMMUNICATIONS, INC., THOMAS J. QUINLAN, JUDITH H. HAMILTON, M. SHÂN ATKINS, MARGARET A. BREYA, FRANCIS J. JULES, THOMAS F. O'TOOLE, RICHARD K. PALMER, DOUGLAS W. STOTLAR, and SHIVAN S. SUBRAMANIAM, | : 1. **VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9**<br>2. **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
|                 Defendants. | |

David Wefer ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.   This action is brought by Plaintiff against LSC Communications, Inc. ("LSC" or the "Company") and the members of LSC's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between LSC and Quad/Graphics, Inc. ("Quad/Graphics").

2.   On October 30, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the Quad/Graphics, pursuant to which, LSC

shareholders will receive 0.625 shares in Quad/Graphics Class A common stock for each share of LSC stock they own (the "Merger Consideration").

3. On December 12, 2018, the Board authorized the filing of a materially incomplete and misleading preliminary joint proxy statement/prospectus (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act that recommends LSC shareholders vote in favor of the Proposed Merger.

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections of Quad/Graphics; (ii) the valuation analyses performed by the Company's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), in support of its fairness opinion; and (iii) background of the Proposed Merger.

5. It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

6. For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger until the material information discussed below is disclosed to LSC shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, LSC's common stock trades on the Nasdaq stock exchange, which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

**PARTIES**

10. Plaintiff is, and has been at all relevant times, the owner of LSC common stock and held such stock since prior to the wrongs complained of herein.

11. Defendant LSC is a Delaware corporation with its principal executive offices located at 191 N. Wacker Drive, Chicago, Illinois 60606. The Company offers a broad range of traditional and digital print, print-related services and office products. LSC's common stock trades on the Nasdaq under the symbol "LKSD."

12. Individual Defendant Thomas J. Quinlan is director of LSC, Chairman of the Board, and Chief Executive Officer of the Company.

13. Individual Defendant Judith H. Hamilton is, and has been at all relevant times, a director of LSC.

14. Individual Defendant M. Shân Atkins is, and has been at all relevant times, Lead Director of LSC.

15. Individual Defendant Margaret A. Breya is, and has been at all relevant times, a director of LSC.

16. Individual Defendant Francis J. Jules is, and has been at all relevant times, a director of LSC.

17. Individual Defendant Thomas F. O'Toole is, and has been at all relevant times, a director of LSC.

18. Individual Defendant Richard K. Palmer is, and has been at all relevant times, a director of LSC.

19. Individual Defendant Douglas W. Stotlar is, and has been at all relevant times, a director of LSC.

20. Individual Defendant Shivan S. Subramaniam is, and has been at all relevant times, a director of LSC.

21. The parties identified in ¶¶ 11-20 are collectively referred to as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

I.   **Background and the Proposed Merger**

22.   LSC focuses on traditional and digital print, print-related services, and office products. The Company's segments are Print and Office Products. The Company, through its Print segment, provides a range of print product offerings, which include magazines, catalogs, retail inserts, books, and directories. In addition to printed products, the Company also provides a number of print-related services, such as supply chain management, mail services, e-book formatting, and distribution services. Its Print segment services over 3,000 customers, including publishers of magazines, books and directories, online retailers, catalogers, mass merchandisers, and contract stationers. In its Office Products segment, the Company manufactures and sells a range of branded and private label products, primarily within the core categories, including filing products, note-taking products, binder products, tax and stock forms, and envelopes. The Office Products segment offers its products to office product superstores, office supply wholesalers, independent contract stationers, mass merchandisers and retailers, and e-commerce resellers. Its office products are produced in and distributed from facilities within North America.

23.   Quad/Graphics, incorporated on July 9, 1971, is a marketing services provider. Their segments are United States Print and Related Services, International and Corporate. The United States Print and Related Services segment consists of Quad/Graphics' United States printing operations.

24.   On October 31, 2018, LSC and Quad/Graphics issued a joint press release to announce the Proposed Merger stating, in relevant part, as follows:

**QUAD/GRAPHICS TO ACQUIRE LSC COMMUNICATIONS IN ALL-STOCK TRANSACTION**

October 31, 2018

5

Business Combination Creates Highly Efficient Print Platform to Fuel Quad's 3.0 Transformation and Strengthen the Role of Print in a Multichannel Media World

SUSSEX, WI, and CHICAGO, IL, October 31, 2018 — Quad/Graphics, Inc. (NYSE: QUAD) ("Quad/Graphics" or "Quad"), a leading marketing solutions provider, and LSC Communications, Inc. (NYSE: LKSD) ("LSC Communications"), a leader in print and digital media solutions, today announced that their boards of directors have approved a definitive agreement whereby Quad will acquire LSC Communications in an all-stock transaction valued at approximately $1.4 billion, including the refinancing of LSC Communications' debt. As of September 30, 2018, the combined company would have had annual revenue of approximately $8 billion.

**STRATEGIC AND FINANCIAL RATIONALE**

- Creates a highly efficient print platform to fuel Quad's 3.0 transformation and strengthen the role of print in a multichannel media world. Quad's 3.0 strategy creates more value for all stakeholders by leveraging a strong print foundation as part of a much larger, more robust integrated marketing solutions offering, and the transaction will broaden Quad's client base and revenue-generating potential.
- Delivers cost- and time-saving opportunities for clients through:
- Enhanced production and distribution efficiencies and flexibility from the greater scale of the combined complementary platforms.
- Expanded logistics services and volume-driven postage savings programs, such as co-mailing, backed by experienced and proven leadership.
- Strengthened print management services and business process outsourcing.
- Maintains long-term strategic vision by preserving Quadracci Family leadership and voting control in the company; Joel Quadracci will be the Chairman, President and Chief Executive Officer of the combined company.
- Is expected to close in mid-2019, and be accretive to earnings, excluding non-recurring integration costs. Net synergies are expected to be approximately $135 million, and will be achieved in less than two years and result in substantial additional Free Cash Flow generation.
- Results in a more profitable company with a strong and healthy balance sheet that provides continued financial flexibility to strategically deploy capital between investing back into the business, making strategic acquisitions and returning capital to shareholders through consistent dividends and share repurchases.

"This is a defining moment in Quad's 47-year journey," said Joel Quadracci, Quad/Graphics Chairman, President & CEO. "We have grown from a printer with a single facility to a global marketing solutions provider with a seamless, integrated offering that creates more value for all our stakeholders at a time of significant

6

media disruption. Together with LSC Communications, we will create a compelling combination of talent, expertise and client technology to further fuel our Quad 3.0 marketing solutions transformation and strengthen the role of print – a proven and trusted media form in today's multichannel world."

Quadracci continued: "We look forward to welcoming LSC Communications' employees to our team. They will be part of a dynamic, values-based organization that is focused on creating a better way for our clients and our company. From this historic business combination, our clients will benefit from a highly efficient print platform, and the additional cost- and time-saving opportunities generated from enhanced production and distribution efficiencies and flexibility, expanded mailing and logistics services, and strengthened print management services. We are confident in the synergies we will generate from this transaction. We will draw on our deep integration experience to successfully align our operations and create long-term sustainable shareholder value. In addition, with an all-stock transaction, our combined shareholders will benefit from our continued strong and healthy balance sheet."

Thomas J. Quinlan III, LSC Communications Chairman, Chief Executive Officer and President, said: "Since becoming a standalone public company at the end of 2016, LSC Communications has added critical scale, capabilities and technologies. We have done so through acquisitions and divestitures as we work to strengthen our position as a leading innovator in print and multichannel logistics. We are now taking the next major step in our evolution. Together with Quad, we will be better positioned in the dynamic industry environment to efficiently serve our clients though a broader set of offerings to help meet and manage their needs. We are pleased that LSC Communications' shareholders will benefit from the significant projected synergies as well as the potential upside enabled by ownership in the combined company. We at LSC Communications are proud of what we have accomplished, and with Quad we look forward to continuing to build on our rich history of providing clients with innovative industry leading solutions."

**TRANSACTION SUMMARY**

Under the terms of the agreement, LSC Communications shareholders will receive 0.625 shares of Quad Class A common stock for each LSC Communications share they own, representing approximately 29 percent total economic ownership of the combined company and approximately 11 percent of the vote of the combined company. Based on the closing share prices of both companies on October 30, 2018, the merger consideration represents a premium of 34 percent to LSC Communications shareholders. Quad shareholders will continue to own Class A and Class B shares, representing approximately 71 percent total economic ownership of the combined company and approximately 89 percent total voting power of the combined company. The transaction supports Quad's long-term strategic vision by preserving the Quadracci Family leadership and voting control in the company.

> Quad expects the transaction to be accretive to earnings, excluding non-recurring integration costs. Net synergies are expected to be approximately $135 million, and will be achieved in less than two years, through the elimination of duplicative functions, capacity rationalization, greater operational efficiencies and greater efficiencies in supply chain management that will also benefit our clients.
>
> Joel Quadracci will be Chairman, President and Chief Executive Officer of the combined company. Quad will expand its board of directors to include two members from LSC Communications' existing board.
>
> The transaction is expected to close in mid-2019, subject to approval by Quad and LSC Communications shareholders, regulatory approval and other customary closing conditions.
>
> The Quadracci Family Voting Trust, holder of approximately 64 percent of the voting power of Quad's outstanding common stock, has entered into a voting agreement with LSC Communications pursuant to which it will vote in favor of the issuance of shares in connection with the transaction.
>
> The closing of the transaction is not contingent on financing. Quad has secured a financing commitment from JPMorgan Chase Bank, N.A. to refinance Quad's existing credit facility and LSC Communications' outstanding debt.
>
> Quad is advised in this transaction by J.P. Morgan Securities LLC, BDT & Company and Foley & Lardner LLP. LSC Communications is advised by BofA Merrill Lynch and Sullivan & Cromwell LLP.

25.     Since entering into the Merger Agreement, the stock prices of both LSC and Quad/Graphics have fallen— Quad/Graphics dropping significantly more than LSC. Accordingly, the implied value of the Merger Consideration has also decreased significantly. The Merger Consideration is inadequate compensation for LSC shares. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

## II. The Proxy Is Materially Incomplete and Misleading

26. On December 12, 2018, LSC filed the Proxy with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote on Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

27. First, the Proxy entirely fails to disclose the Quad/Graphics projections prepared by LSC management (the "LSC-Quad/Graphics Projections") or any unlevered free cash flows from the Quad/Graphics projections prepared by Quad/Graphics management (the "Quad/Graphics Projections"). The LSC-Quad/Graphics Projections were explicitly reviewed by BofA Merrill Lynch in preparing their fairness opinion, discussed with the management of LSC in assessing the relative likelihood of achieving the future financial results reflected in the Quad/Graphics Projections and the LSC-Quad/Graphics Projections, and utilized in BofA Merrill Lynch's *Discounted Cash Flow Analysis* of Quad/Graphics. Perhaps nothing is more relevant to shareholders voting on a stock-based merger than the earnings picture of the acquiring company and it is indisputable that the unlevered free cash flows were the most important input in BofA Merrill Lynch's Discounted Cash Flow Analysis—the entire analysis is based upon discounting the cash flows to present value. However, Defendants elected to exclude the LSC-Quad/Graphics Projections and the Quad/Graphics unlevered free cash flow projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of the Discounted Cash Flow Analysis and Quad/Graphics' projections.

28.     Defendants elected to summarize the projections for Quad/Graphics on page 99 of the Proxy, but they excised and failed to disclose the most important projections—Quad/Graphics' unlevered free cash flows. The omission of Quad/Graphics unlevered free cash flow projections renders the projection table on page 99 of the Proxy incomplete and misleading because, without the Quad/Graphics unlevered free cash flow projections, the projection summary provides a misleading overall valuation picture of Quad/Graphics.  This is caused by significant differences between unlevered free cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the EBITDA projections that were included in the Proxy.

29.     EBITDA projection metrics *are not sufficient analogs for cash flow projections*. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] BofA Merrill Lynch agrees, as indicated by their use of the unlevered free cash flows—not EBITDA—in performing their Discounted Cash Flow Analysis, and academics and practitioners concur.[2,3,4] As Warren Buffet and other financial experts have stated: "References to

---

[1]     Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2]     "Morningstar's Approach to Equity Analysis and Security Valuation." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305. ("We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise.").

[3]     Copeland, Thomas. *Financial Theory and Corporate Policy*. 3rd ed. 24. ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").

[4]     Brealey, Richard, Stewart Myers, and Franklin Allen. "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80. ("This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for

10

EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[5] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[6] As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

30. In light of these significant differences between the Quad/Graphics unlevered free cash flow projections on the one hand, and the EBITDA figures disclosed in the Proxy, the table of projections on page 99 of the Proxy is materially incomplete and misleading. By failing to include the Quad/Graphics unlevered free cash flow projections, the table provides a materially incomplete and misleading overall valuation picture of Quad/Graphics. Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

31. Moreover, each company's management prepared two distinct sets of projections—one set of projections for their company and one set of projections for the other company. By omitting the LSC-Quad/Graphics Projections, the Proxy precludes LSC shareholders from seeing the insight their Board has into the Quad/Graphics future financial performance. Further, the LSC

---

the present value of any other asset. We just discount the cash flows…. Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share.") (emphasis in the original).

[5] Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[6] Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

projections prepared by Quad/Graphics present LSC as significantly less valuable than the LSC projections prepared by LSC. This makes sense, as Quad/Graphics had a strong financial incentive to negotiate a lower valuation of LSC. Thus, it would also make sense that the LSC-Quad/Graphics Projections show Quad/Graphics to be much less valuable than the Quad/Graphics Projections. However, the LSC-Quad/Graphics Projections are the only set of projections entirely omitted from the Proxy.

32. The omission of the LSC-Quad/Graphics Projections and the Quad/Graphics unlevered free cash flow projections renders the financial projections included in the Proxy misleading. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by BofA Merrill Lynch, but have omitted the LSC-Quad/Graphics Projections and the Quad/Graphics unlevered free cash flow projections. Thus, their omission renders the projections disclosed on page 99 misleading.

33. Second, in summarizing the *Discounted Cash Flow Analysis* prepared by BofA Merrill Lynch, the Proxy fails to disclose the following key information—in addition to the omission of the LSC-Quad/Graphics Projections—used in their analysis: (i) the inputs and assumptions underlying the calculation of the LSC discount rate range of 8.25% to 9.25%, including the WACC and CAPM components; (ii) the inputs and assumptions underlying the calculation of the Quad/Graphics discount rate range of 8.00% to 9.00%, including the WACC and CAPM components; (iii) the inputs and assumptions underlying selection of the 4.5x to 5.5x

terminal multiples used to derive the terminal values for both companies; and (iv) the actual terminal values calculated for each company.

34. These key inputs are material to LSC shareholders, and their omission renders the summary of the Discounted Cash Flow Analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

35. Without the above-omitted information and the unlevered, after-tax free cash flows from the LSC-Quad/Graphics Projections LSC shareholders are misled as to the reasonableness or reliability of BofA Merrill Lynch's analysis, and unable to properly assess the fairness of the Proposed Merger. As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

36. Third, in the *Background of the Merger* section, the Proxy states that "the members of the LSC board of directors (i) determined that the merger is fair and in the best interests of, LSC and its stockholders, (ii) approved and declared advisable the merger agreement, the voting and support agreement, the merger and the other transactions contemplated by the merger agreement and (iii) recommended adoption of the merger agreement to the stockholders of LSC." Proxy at 74. Yet, the Proxy fails to disclose whether all members of LSC's Board attended the meeting and voted in favor of these actions, whether the decision was unanimous, and whether any Board member voted against the Proposed Merger—and if so, why. In stark contrast, the next paragraph of the Proxy states that "the Quad/Graphics board of directors **unanimously**: (i) determined that the merger and the other transactions contemplated by the merger agreement are in the best interests of Quad/Graphics, (ii) approved the merger agreement, the merger and the issuance of shares of Quad/Graphics class A common stock in connection with the merger and (iii) resolved to recommend that the holders of Quad/Graphics common stock approve the issuance of shares of Quad/Graphics class A common stock in connection with the merger (i.e., the share issuance proposal)." Proxy at 75 (emphasis added).

37. Information provided to shareholders regarding how each member of a board of directors votes on the recommendation or the approval of a merger is material to the shareholders being asked to approve the merger. Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest. Naturally, then, the shareholder faced with a proxy request will think it important to know the directors' beliefs about the course they recommend and their specific reasons for urging the shareholders to embrace it. When a board

chooses to disclose a course of events or to discuss a specific subject, it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression. Disclosures must provide a balanced, truthful account of all matters they disclose. Given the plain difference in the language describing the LSC Board's approval of the Proposed Merger and Quad/Graphics Board's "unanimous[]" approval of the Proposed Merger—in the next paragraph—the statement describing the LSC Boards approval of the Proposed Merger is misleading with respect to material fact.

38. In sum, the omission and/or misrepresentations the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff and other LSC shareholders will be unable to cast an informed vote in connection with the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act**

39. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

41.  Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

42.  The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

43.  Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) Quad/Graphics financial projections; (ii) the valuation analyses performed by BofA Merrill Lynch; and (iii) the background of the Proposed Merger.

44.  In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

45.  Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual

Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections and the details surrounding discussions with other interested parties and BofA Merrill Lynch. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review BofA Merrill Lynch's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46.  Each of the Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it—which they were required to do carefully. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of financial projections.

47.  LSC is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

48.  The misrepresentations and omissions in the Proxy are material to Plaintiff and other LSC shareholders, and will deprive them of their right to cast an informed vote if such

misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

49. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50. The Individual Defendants acted as controlling persons of LSC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of LSC, and participation in and/or awareness of the LSC's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of LSC, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

51. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of LSC, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed

by the Board prior to voting on the Proposed Merger.  The Proxy at issue contains the recommendation of the Board to approve the Proposed Merger.  The Individual Defendants were thus directly involved in the making of the Proxy.

53.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

A.    Preliminarily enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing

the Proposed Merger, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

B.  Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.  Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 2, 2019

Respectfully submitted,

*/s/ Juan E. Monteverde*
Juan E. Monteverde

**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*